**CHARLES J. FLEISHMAN**
Bar# 46405
A Professional Corporation
19839 Nordhoff Street
Northridge, CA, 91324
erisa@erisarights.com
Telephone: (818) 350-6285
Fax: (818) 350-6272
Attorney for Plaintiff

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| GRACIELA SAFFON | NO.  CV04-1237 ODW(RZx) |
| Plaintiff, | PLAINTIFF'S TRIAL BRIEF |
| vs. | Trial Date: March 18, 2009<br>Time:  1:30 p.m.<br>Courtroom 11 |
| WELLS FARGO & COMPANY LONG TERM<br>DISABILITY PLAN, an ERISA plan;<br>DOES 1 through 10, inclusive, | Judge Otis D. Wright II |
| Defendants. | |

# TABLE OF CONTENTS

I. THE NINTH CIRCUIT'S OPINION . . . . . . . . . . . . . . . . . . 3

II. NEW EVIDENCE SUBMITTED PER NINTH CIRCUIT DECISION . . . 6

III. THE CLAIM . . . . . . . . . . . . . . . . . . . . . . . . . . 8

    A. The Plan/Policy . . . . . . . . . . . . . . . . . . . . . 8

    B. The Facts of the Claim . . . . . . . . . . . . . . . . . . 9

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

1

## TABLE OF AUTHORITIES

2   <u>Abatie v. Alta Health</u> 458 F.3d 955 (9th Cir. 2006)     3

3   <u>Booton v. Lockheed</u> 110 F.3d 1461 (9th Cir. 1997)     5

4   <u>Lamanna v. Special Agents</u> 546 F.Supp.2d 261 (W.D. Pa. 2008)     8

5   <u>Michael v. American International</u> 2008 U.S. Lexis 69421 (ED Mo 2008)     8

6   <u>Prado v. Domecq</u> 2008 WL 191985 (N.D. Cal. 2008)     14

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Charles J. Fleishman

# I. THE NINTH CIRCUIT'S OPINION

This case is before the court after a ruling by the Ninth Circuit reversing a judgment for the defendant. It has been remanded back to the District Court for reexamination because the original decision, being prior to the Ninth Circuit's opinion in <u>Abatie v. Alta Health</u> 458 F.3d 955 (9th Cir. 2006), "didn't take MetLife's conflict of interest into account." <u>Saffon v. Wells Fargo</u> 522 F.3d 863, 868 (9th Cir. 2008).

MetLife insured and administered a long term disability plan under which the plaintiff was a beneficiary. She received long term disability benefits from MetLife for a year at which time MetLife decided that she was no longer eligible. She appealed the termination of her benefits. MetLife denied the appeals and this litigation followed.

In its decision, the Ninth Circuit made several observations that reflect on MetLife's conflict of interest, over and above its inherent conflict of interest as plan administrator and plan benefit payor, and thereby affect the standard of review that should be applied by this court to MetLife's decision to terminate the plaintiff's benefits. They are listed, not necessarily in the order in which they appear in the opinion, below:

1. MetLife's communications with the plaintiff and her doctors "are hardly a model of clarity; they certainly do not explain 'in a manner calculated to be understood by the claimant' what Saffon must do to perfect her claim." <u>Saffon</u> @ 870.

2. MetLife's request for objective medical evidence did not explain why the evidence which she had already given MetLife was insufficient.

3. MetLife's decision to deny the administrative appeal rested on the opinion of it's hired doctor, Dr. Menotti. He wrote that he was unconvinced that Ms. Saffon's self-reported headaches and chronic back syndrome pain were enough to preclude her from working. "Dr. Menoti does not explain why he is

1  unconvinced, nor what Saffon or Dr. Kudrow [the treating doctor] would need to

2  do to convince him." <u>Saffon</u> @ 871.

3      4. One of the reasons given for terminating the benefits was that an MRI

4  done on April 28, 2003 showed no change from an MRI of January 12, 2002.

5  Since MetLife had been paying benefits for one year and had thus made a finding

6  that the plaintiff was disabled, a lack of change in the MRI could hardly be

7  evidence of Saffon no longer being disabled.  "In order to find her no longer

8  disabled, one would expect the MRIs to show an *improvement*, not a lack of

9  degeneration."  <u>Saffon</u> @ 871

10     5. MetLife communicated directly with the plaintiff's doctors without telling

11  her.  Dr. Kudrow was sent a report of a MetLife doctor and told that unless he

12  responded to the report within ten days, MetLife would assume that he agreed with

13  it.  Since the plaintiff was never told about this contact with her doctor, she was

14  in no position to urge him to respond timely.

15     In another incident, MetLife contacted Dr. Soderlund, plaintiff's primary

16  care doctor "who had very little to do with Saffon's treatment for her back injury."

17  It then relied on this doctor's lack of information and opinion regarding Ms.

18  Saffon's disabling condition.  Evidence recently supplied to this court in the form

19  of a report from Dr. Barry S. Ostroff also relies on Dr. Soderlund's uninformed

20  opinion.   That Soderlund had little to no knowledge of the plaintiff's state of

21  disability is shown by a statement that he wrote and that was submitted to the trial

22  court and defendant in the prior district court trial.  It appears in the excerpts of

23  record before the Ninth Circuit at page 113B; a copy is attached.  Dr. Soderlund

24  wrote that Ms. Saffon is "quite likely permanently disabled" and that "she has

25  received the majority of her care from outside neurologist Dr. David Kudrow who

26  can likely give a much more thorough and expert opinion regarding Graciela's

27  condition."  Thus, we can add another factor to the scale upon which the degree

28  of MetLife's discretion should be measured; MetLife is, even now, using the

1  opinion of an "expert" who relies on the opinion of a doctor that MetLife knows,
2  both from the Ninth Circuit's opinion and from the evidence submitted by the
3  doctor himself, had little to no knowledge about the plaintiff's condition. Either
4  MetLife failed to show its Dr. Ostroff the Ninth Circuit's opinion in this case and
5  everything Dr. Soderlund wrote on the subject of Graciela Saffon or Dr. Ostroff
6  was shown the opinion and the Soderlund note and just decided to ignore them.
7  In either case, MetLife should know better, by now, than to rely on opinions that
8  are based on known factual errors.

9      6. MetLife "took various of [Saffon's] doctors' statements out of context
10 or other wise distorted them in an apparent effort to support a denial of benefits."
11 The Ninth Circuit gave an example. Dr. Kudrow had written that Ms. Saffon
12 could try to return to working "if she feels that she is able." MetLife dropped the
13 quoted phrase and relied on the remainder as support for its allegation that the
14 plaintiff could return to working.

> "There is a world of difference between saying a patient can return to work
> and saying she should return to work *if* she feels she is able to do so:
> Omitting the distinction could be a sign of either inattention to important
> details or bad faith. In either event, it suggests less deference should be
> given to the decision of the claims administrator." Saffon @ 873.

18     In its opinion, the Ninth Circuit relied on its decision in Booton v. Lockheed
19 110 F.3d 1461 (9th Cir. 1997) and noted that "MetLife cannot be faulted for taking
20 our instruction in Booton too seriously." Saffon @ 870. Well, *deja vu* all over
21 again. MetLife cannot be faulted for taking the instructions in the Ninth's
22 Circuit's opinion in this case too seriously either. MetLife's "independant" Dr.
23 Ostroff, in the report just now submitted by the defendant to this court, wrote,
24 "[Dr. Kudrow] indicated in his 1/23/03 interim/follow-up appointment note that he
25 recommended that the claimant consider a return to work trial." Didn't the Ninth
26 Circuit point out to MetLife that the Kudrow statement also includes the phrase,
27 "if she feels that she is able?" The first time may have been "inattention to
28 important details" but to do it twice, after being admonished by the court, has got

Charles J. Fleishman

1  to be bad faith.

2      7. MetLife, in its letter denying the administrative appeal, at a time when

3  it was too late for the plaintiff to take any action, wrote that the plaitiff's claim is

4  not supported by a Functional Capacity Evaluation (FCE).

5      8.    Finally, in denying the administrative appeal and affirming the

6  termination of benefits, MetLife relied on the fact that the plaintiff's claim was not

7  supported by an FCE.  As will be discussed further on in this brief, FCE testing

8  is unreliable, especially with regard to back problems, and is not designed to

9  measure pain.  The plaintiff's disability is the result of severe back pain.  The

10  Ninth Circuit recognized that if FCE testing of Ms. Saffon would have been

11  useless at the time her benefits were terminated, MetLife's reliance on the lack of

12  such testing "may bear on the degree of deference the district court shall accord

13  MetLife's decision and on its ultimate determination as to whether Saffon is

14  disabled." Saffon @ 873.

15  **II. NEW EVIDENCE SUBMITTED PER NINTH CIRCUIT DECISION**

16      The Ninth Circuit opinion not only described MetLife's actions that evidence

17  the degree that its conflict of interest interferred with its fiduciary duty, it also

18  gave some guidance for the proceedings in this court.  The opinion states that the

19  plaintiff should be allowed to present the results of FCE testing to this court, if she

20  wishes, or "offer evidence that such evidence is not available or not particularly

21  useful in diagnosing her ability to return to her job." Saffon @ 872.  The evidence

22  submitted by both parties to this court proves that an FCE at this time will not be

23  probative on the issue of her ability to work at the time her benefits were

24  terminated.

25      The plaintiff has presented evidence to this court in the form of medical

26  journals dealing with the efficacy of FCE testing.

27      The journal Physical Therapy, volume 78, number 8, August 1998,

28  Plaintiff's Exhibit D, points out that FCE's are completely unreliable for a number

of reasons.   Those reasons include lack of research, lack of protocol, lack of uniform criteria, lack of standardization, lack of any ability to project what a person could perform in an 8 hour day, significant safety deficiencies, and nearly no peer-reviewed journal articles regarding reliability.  One example of a problem with the testing is when a person fails to participate in a task.  Is it because of pain or inability?  The tester could unilaterally conclude, without any valid reliable basis, that the patient is not putting out maximal effort.   Also, there is no standardization with regard to the training required to interpret the results of an FCE.

The article taken from The Journal of Occupational Rehabilitation, vol 13, number 4, Dec. 2003, Exhibit E, notes that "all reviews in the 1990s have concluded that the quantity and/or quality of published FCE research was insufficient to support claims of reliability and validity."  203.  "The results of FCEs are by definition compared to the anticipated physical workload of the client. ... Until now, too little efforts have been made to systematically analyze the psychometrics of the workload assessments performed routinely in conduction with FCEs."  204.  "FCEs are criticized because of their claim of 'objective testing of functional capacity.'  All involved in FCEs (including marketers) must realize that this point of critique is correct.  Performance and not capacity is evaluated."  205.  "It is . . . by definition incorrect to suggest or to claim that the results of an FCE should be able to predict a person's work ability, or even more complex, a successful return to work."  205.

In the article "Practical Aspects of Functional Capacity Evaluations," Journal Of Occupational Rehabilitation, Vol. 14, Number 3, September 2004, Exhibit F, it is pointed out that although widely used, there persist a number of scientific, legal, and practical concerns with regard to FCEs.  Key problems are that sincerity of effort, ability to perform complex or variable jobs, and prediction of injury are problematic.

1  The last article, Exhibit G, from the <u>Journal Of Occupational Rehabilitation,</u>

2  Vol. 11, Number 2, June 2001, deals with FCE testing and back problems. The

3  study concludes that FCEs may not be necessary or valid in assessing the physical

4  performance of people with chronic back pain. The plaintiff's disability claim

5  grows from her chronic pack pain following an auto accident.

6  Finally,

7  "A 'FCE measures the residual occupational abilities of a patient per
National Institute for Occupational Safety and Health Guidelines.' (Citation

8  omitted). Accordingly, the usefulness of the results of a FCE are extremely
limited. It is important to note that 'that (sic) tests of strength such as a

9  [FCE] can neither prove nor disprove claims of disabling pain.' <u>Lamanna
v. Special Agents Mut. Benefits Ass'n, 546 F.Supp.2d 261, 296 (W.D. Pa.</u>

10  <u>2008).</u>" <u>Michael v. American International 2008 U.S. Lexis 69421 (E.D.
Mo. 2008).</u>

11

12  In that the plaintiff's claim of disability is based on her chronic back pain and in

13  that an FCE cannot measure back pain and cannot prove or disprove claims of

14  disabling pain, MetLife's denial of the administrative appeal because there was no

15  FCE was a turning down of the claim "based on Saffon's failure to produce

16  evidence that simply is not available" and should "bear on the degree of deference

17  the district court shall accord MetLife's decision" terminating benefits.

18  To avoid this conclusion, the defendant's Dr. Ostroff posits an impossible

19  scenario. If there were a perfect FCE existing at the time the plaintiff's benefits

20  were terminated, it could have been used to test her ability to return to work. The

21  point is that FCE testing in its present state is not perfect at all.

### III. THE CLAIM

#### A. The Plan/Policy

23  The plan defines disability, as it applies to the facts of this case, to exist

24  when "due to sickness, pregnancy or accidental injury, you are receiving

25  Appropriate Care and Treatment from a Doctor on a continuous basis; and . . . you

26  are unable to earn more than 80% of your Predisability Earnings or Indexed

27  Predisability Earnings at your Own Occupation for any employer in your Local

28

1  Economy." SPD 13-14[1].

2  B. The Facts of the Claim

3  On December 20, 2001, Ms. Saffon was in her vehicle, stopped at a signal
4  when she was struck from the rear by another car. That same evening she began
5  experiencing neck, mid and low back pain, and bilateral hand and arm tingling.
6  She saw Dr. Kerry Haydel, chiropractor, the next day. She had seen him
7  previously for headaches and neck pain and had been diagnosed with a herniated
8  cervical disc in 1988. Ms. Saffon still complains of headaches, neck, mid and low
9  back pain, bilateral arm and hand tingling, left knee pain, blurred vision, dizziness,
10  and difficulty sleeping secondary to the neck and back pain. X-rays taken on
11  December 24, 2001, were positive for loss of cervical lordosis from C4 through
12  C7, severe disc degeneration C5-6 and C6-7, osteophytes at C5 and 6, and
13  encroachment on the neuroforamen at C5-6 and 6-7. AR 98-99, 92-93.

14  As a result of her accident and the injuries she sustained, Ms. Saffon stopped
15  working on or about January 7, 2002. AR 128. The plan provides for a waiting
16  period of 22 weeks from the time disability begins during which benefits are not
17  payable. SPD 7. Thus, disability benefits became payable to Ms. Saffon on June
18  10, 2002.

19  On January 12, 2002, Ms. Saffon was sent by her treating neurologist, Dr.
20  David Kudrow, for an MRI examination. The findings of the MRI were
21  "Straightening of the normal cervical curve," osteophytes at C5 and 6, disc
22  desiccation through much of the neck, disc protrusions of 2 mm into the spinal
23  canal at C3-4, 2 mm into the spinal canal at C4-5, 4-5 mm into the spinal canal
24  at C5-6, and disc protrusions of 3-4 mm into the spinal canal at C6-7. AR 267.

25  On April 4, 2002, Dr. Kudrow wrote that Ms. Saffon was suffering from

26

27  [1] The numbers correspond to the Bates numbering of the administrative record filed with the court before the appeal to the Ninth Circuit.

28

Charles J. Fleishman

1   "moderate to severe headaches, . . . a constant and increasingly severe pain with

2   the muscle tightness in the muscles of the neck, shoulders and head," and

3   "numbness at times in the left upper extremity."  AR 221.  He noted that the

4   positive findings of the MRI of January 12 "certainly may be contributing to her

5   array of symptoms."  AR 222.

6      On May 6, 2002, Dr. Kudrow noted Ms. Saffon's symptoms as being

7   moderately severe headaches, neck pain that limited movement and shoulder pain.

8   Further, it was noted that when Ms. Saffon "lays down on her back, her left arm

9   and leg goes (sic) numb.  So far, the Zanaflex has worked the best of all

10   medications.  Once she takes it in the morning, she gets tired, sleepy and dizzy

11   and must sit down."  AR 208.

12      On June 13, 2002, Dr. Kudrow filled out a MetLife form regarding his

13   patient's condition.  In it he reiterated Ms. Saffon's symptoms of migraine

14   headaches and neck pain and the findings of the MRI.  Additionally, he wrote that

15   he first saw the plaintiff on January 7, 2002, at which time he told her not to

16   return to work.  He described Ms. Saffon's abilities as limited to one hour,

17   intermittently, of sitting, standing and walking.  He wrote that she was unable to

18   work.  AR 190-192.  He reiterated his findings and opinions in another MetLife

19   form that was signed by him on August 29, 2002.  AR 156-158.

20      A Dr. Thomas wrote, at the request of MetLife, without meeting or

21   examining Ms. Saffon, a medical records review report on January 6, 2003.  In it

22   he noted that "this file lacks, detailed, objective, functional findings or testing

23   which would completely preclude" "a trial return to work at a sedentary duty

24   level."  AR 278.

25      On January 29, 2003, Dr. Kudrow wrote that Ms. Saffon's symptoms were

26   "moderately severe headache every day on almost a constant basis[,] . . . neck pain

27   which is moderately severe . . ." and "she has difficulty concentrating and has

28   difficulty attending to tasks."  Regarding Ms. Saffon's ability to work, he wrote,

Charles J. Fleishman

1  "I would encourage the patient to a trial of work <u>if she feels that she is able</u>." AR
2  65.

3       Ms. Saffon wrote to MetLife on March 17, 2003.  She explained that she
4  was no longer taking any medication for her condition "because everything that
5  has been prescribed has had no beneficial effect and in addition gave me severe
6  side effects."   Additionally, she wrote that her condition had not changed for a
7  year and that her headaches and neck pain were "moderately severe 24 hours a
8  day."  Regarding a trial of work she wrote, "I do not feel capable at this time, the
9  constant pain makes it very difficult for me to concentrate and to even carry out
10 simple tasks.  When the pain gets very severe, it affects my memory and even my
11 speech.  I do wear a neck brace most of the time, but I'm still unable to stay in
12 any one position for more than a few minutes at a time, if I do, the pain on my
13 neck becomes unbearable from the pressure, which in turn makes my headaches
14 even worse, especially when I try to do things that require me to look down, like
15 writing, reading, even simple things like cooking, doing dishes, or even sitting
16 down to pay bills, have become very difficult."  AR 63-64.

17      MetLife had Dr. Thomas review the plaintiff's medical records again on
18 April 18, 2003.  In answer to the question of whether the medical information
19 contains "clear, detailed, objective medical documentation supporting inability to
20 return to own work/occupation" he responded in the negative.  Yet, he recognized
21 that "Certainly there are recognized degenerative changes about the cervical spine
22 which, in all likelihood, produce ongoing discomfort and headache."   He then
23 noted the truism that "pain is a subjective finding."  He concluded his report with
24 a "long series of unconected adjectives" totally meaningless to the plan's test for
25 disability: "this file lacks clear, sequential, detailed, objective clinical information
26 which would completely preclude Ms. Saffon from an attempt at return to work
27 as a (sic) Administrative Assistant -- Mortgage."  AR 51-53.

28

Charles J. Fleishman

1    MetLife sent Dr. Thomas's April 18, 2003 report to Dr. Kudrow.  He was
2    asked if he agreed with the expressed "findings."  MetLife told him that if he did
3    not respond by May 5, 2003, "we will presume you are in agreement with the
4    findings of the review."  AR 55.

5        On June 23, 2003, after paying benefits to the plaintiff since June 10, 2002,
6    based on a finding that she was unable to perform her regular occupation, MetLife
7    terminated the benefits retroactive to June 16, 2003.  It is important to understand
8    that the termination of benefits was not because of a change in the test for
9    disability from "own occupation" to " any occupation."  The plan/policy provides
10   for 24 months of benefits under the "own occ" definition of disability and the
11   plaintiff had only received one year of benefits at the time they were terminated.
12   The termination letter was in the most general of terms.  In spite of the positive
13   X-ray (AR 92) and MRI (AR 267) findings that show significant disc
14   encroachments at multiple levels into the spinal canal, it falsely told Ms. Saffon
15   that "Physical examinations have been within normal limits."  The letter said, "The
16   medical information provided no longer provides evidence of disability that would
17   prevent you from performing your job or occupation.  You no longer meet the
18   definition of disability. . ."  AR 49.

19       On July 28, 2003, Dr. Kudrow responded to MetLife's request for his
20   comments on the report authored by Dr. Thomas.  Dr. Kudrow pointed out that
21   "MRI of the cervical spine revealed significant disc and osteophyte changes in the
22   cervical spine suggesting a root cause of her chronic neck pain and perhaps
23   headaches. . . . She remains unable to function at her previous level of productivity
24   and in fact is unable to tolerate sustained sitting, standing, bending, lifting,
25   computer work etc.  This problem renders her disabled and has thus far precluded
26   her from achieving any level of gainful employment."  AR 41.

27       On August 1, 2003, Ms. Saffon administratively appealed the termination of
28   her benefits.  AR 44.

1    Dr. Robert Menotti on behalf of MetLife did a medical record review and
2  wrote a truly inane report on September 15, 2003.    AR 22-23.    It must be
3  remembered that Dr. Kudrow had been treating Ms. Saffon from January 2002
4  while Drs. Menotti and Thomas had never met her.   In commenting on the last
5  report from Dr. Kudrow, Dr. Menotti wrote: "He [Dr. Kudrow] states that she is
6  unable to function at her previous level of productivity and is unable to tolerate
7  sustained sitting, standing, bending, lifting, or computer work. *This is despite the*
8  *fact that she has never returned to work and therefore we do not know specifically*
9  *what this claimant is able to tolerate or not with respect to her capacity to return*
10 *to work.*"  (Emphasis added.)  Dr. Menotti ignored the plaintiff's inability to carry
11 out even simple tasks such as cooking, doing dishes, and sitting down to pay bills.
12 AR 63-64.    Dr. Menotti further noted that "The MRI of April 28, 2003, is
13 unchanged from that of 01/12/02."

14    On September 23, 2003, MetLife denied the administrative appeal.  AR 24-
15 26.   In the denial letter, MetLife, acknowledged that Dr. Kudrow was of the
16 opinion that Ms. Saffon was disabled; that an MRI revealed "significant disc and
17 osteophyte changes of the cervical spine;" and that Dr. Kudrow reported that the
18 plaintiff was "unable to function at your previous level of productivity and are
19 unable to tolerate sustained sitting, standing, bending, lifting, computer work, etc."
20 But, MetLife stated for the first time, "It is not clear what Dr. Kudrow's used as
21 a basis for these reported limitations as we've not been furnished with a Functional
22 Capacity Evaluation that would objectively measure and document your current
23 level of functional ability."

24    As pointed out by the Ninth Circuit opinion, MetLife had never before
25 suggested, sought, asked for, or hinted at a Functional Capacity Evaluation (FCE)
26 to the plaintiff or Dr. Kudrow.   Neither Dr. Thomas nor Dr. Menotti had ever
27 mentioned an FCE.  Furthermore, if MetLife questioned the ability of Dr. Kudrow
28 to evaluate Ms. Saffon's ability to work because there was no FCE, how could it

*Charles J. Fleishman*                           13

1    accept the opinions of Drs. Thomas and Menotti? They not only had no FCE to

2    base their opinions on, they, unlike Dr. Kudrow, had never even seen Ms. Saffon.

3         The denial letter relied on the record review report done by Dr. Menotti

4    discussed above. Relied upon as a reason justifying the termination of benefits

5    was the fact that "the MRI of April 28, 2003 documents degenerative changes

6    from C5/6-C6/7, but indicates this is unchanged from the prior January 12, 2002

7    MRI. No progression in degeneration is documented." This argument, as pointed

8    out above, was rejected by the Ninth Circuit.

9         The other reason given for denying the administrative appeal was the fact

10   that the plaintiff's disability resulted from self reported pain; MetLife ignored the

11   MRI's and xrays that evidenced the underlying causes of the pain. There is no

12   provision in the policy/plan excluding from benefits disability caused by subjective

13   pain. Furthermore, the Ninth Circuit in its opinion in this case pointed out that

14   "individual reactions to pain are subjective and not easily determined by reference

15   to objective measurements. If MetLife is turning down Saffon's application for

16   benefits based on Saffon's failure to produce evidence that simply is not available,

17   that too may bear on the degree of deference the district court shall accord

18   MetLife's decision and on its ultimate determination as to whether Saffon is

19   disabled." Saffon 872-873. In Prado v. Domecq 2008 WL 191985 (N.D. Cal.

20   2008) the defendant argued, as did MetLife in this case, that the claimant's pain

21   complaints were not supported by objective evidence. The court responded that

22   such an argument, "however, is undermined by Saffon. Liberty may not ignore

23   Plaintiff's subjective pain complaints and instead rely solely on objective evidence

24   if evidence of Plaintiff's pain is not available. Given the not-insubstantial

25   evidence of Plaintiff's disability, the Court hereby finds that Liberty abused its

26   discretion in denying Plaintiff disability benefits."

27                          **CONCLUSION**

28        In view of the objective evidence that supports the existence of physical

Charles J. Fleishman

factors that could cause the pain Ms. Saffon complains about, the belief of her treating doctor that she is totally disabled from all work, and the evidence of MetLife's conflict of interest, which evidence is also evidence of abuse of discretion, the plaintiff should be awarded judgement for arrears to date, interest on the arrears, reinstatement to the plan, attorney fees and costs.

Respectfully submitted,

/s/

Charles J. Fleishman