**THE FLEISHMAN LAW FIRM**
Charles J. Fleishman Bar# 46405
Paul A. Fleishman Bar# 251657
19839 Nordhoff St.
Northridge, California 91324
Telephone:  (818) 350-6285
FAX: (818) 350-6272
erisa@erisarights.com
Attorneys for Plaintiff



FILED
CLERK, U.S. DISTRICT COURT

SEP 1 5 2009

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

GRACIELA SAFFON

        Plaintiff,

    vs.

WELLS FARGO & COMPANY LONG TERM
DISABILITY PLAN, an ERISA plan;
DOES 1 through 10, inclusive,

        Defendants.

NO.  CV04-1237 ODW(RZx)

[~~PROPOSED~~] FINDINGS OF FACT
AND CONCLUSIONS OF LAW

    After the matter was remanded back from the Ninth Circuit Court of Appeals, a court trial on the administrative record held on July 9, 2009. The court now makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

    1. The plaintiff, Graciella Saffon, was, through her employment with Wells Fargo Bank, covered by an ERISA long-term disability plan insured by Metropolitan Life Insurance Company (MetLife).  SPD 32.

    2.  On December 20, 2001, Ms. Saffon was in her vehicle, stopped at a signal when she was struck from the rear by another car.  That same evening she began experiencing neck, mid and low back pain, and bilateral hand and arm tingling.  She saw Dr. Kerry Haydel, chiropractor, the next day.  She had seen him previously for headaches and neck pain and had been diagnosed with a herniated cervical disc in 1988. Six months after the December 2001 accident, Ms. Saffon

1

1   was complaining about headaches, neck, mid and low back pain, bilateral arm and
2   hand tingling, left knee pain, blurred vision, dizziness, and difficulty sleeping
3   secondary to the neck and back pain. X-rays taken on December 24, 2001, were
4   positive for loss of cervical lordosis from C4 through C7, severe disc degeneration
5   C5-6 and C6-7, osteophystes at C5 and 6, and encroachment on the neuroforamen
6   at C5-6 and 6-7. AR 92-93, 98-99.

7       3.  As a result of her accident and the injuries she sustained, Ms. Saffon
8   stopped working on or about January 7, 2002. AR 128.

9       4.  The plan provides for a waiting period of 22 weeks from the time
10  disability begins during which benefits are not payable. Thus, disability benefits
11  became payable to Ms. Saffon on June 10, 2002. SPD 7.

12      5.  On January 12, 2002, Ms. Saffon was sent by her treating neurologist,
13  Dr. David Kudrow, for an MRI examination.  The findings of the MRI were
14  "Straightening of the normal cervical curve," osteophytes at C5 and 6, disc
15  desiccation through much of the neck, disc protrusions of 2 mm into the spinal
16  canal at C3-4, 2 mm into the spinal canal at C4-5, 4-5 mm into the spinal canal
17  at C5-6, and disc protrusions of 3-4 mm into the spinal canal at C6-7. AR 267.

18      6.  On April 4, 2002, Dr. Kudrow wrote that Ms. Saffon was suffering from
19  "moderate to severe headaches, . . . a constant and increasingly severe pain with
20  the muscle tightness in the muscles of the neck, shoulders and head," and
21  "numbness at times in the left upper extremity."  He noted that the positive
22  findings of the MRI of January 12 "certainly may be contributing to her array of
23  symptoms." AR 221-222.

24      7.  On May 6, 2002, Dr. Kudrow noted Ms. Saffon's symptoms as being
25  moderately severe headaches, neck pain that limited movement and shoulder pain.
26  Further, it was noted that when Ms. Saffon "lays down on her back, her left arm
27  and leg goes (sic) numb.  So far, the Zanaflex has worked the best of all
28  medications.  Once she takes it in the morning, she gets tired, sleepy and dizzy

Charles J. Fleishman

2

1    and must sit down." AR 208.

2        8. On June 13, 2002, Dr. Kudrow filled out a MetLife form regarding his
3    patient's condition.   In it he reiterated Ms. Saffon's symptoms of migraine
4    headaches and neck pain and the findings of the MRI. Additionally, he wrote that
5    he first saw the plaintiff on January 7, 2002, at which time he told her not to
6    return to work.   He described Ms. Saffon's abilities as limited to one hour,
7    intermittently, of sitting, standing and walking.  He wrote that she was unable to
8    work. AR 190-192. He reiterated his findings and opinions in another MetLife
9    form that was signed by him on August 29, 2002. AR 156-158.

10       9. A Dr. Thomas wrote, at the request of MetLife, without meeting or
11   examining Ms. Saffon, a medical records review report on January 6, 2003. In it
12   he noted that "this file lacks, detailed, objective, functional findings or testing
13   which would completely preclude" "a trial return to work at a sedentary duty
14   level." AR 278.

15       10. On January 29, 2003, Dr. Kudrow wrote that Ms. Saffon's symptoms
16   were "moderately severe headache every day on almost a constant basis[,] . . .
17   neck pain which is moderately severe . . ." and "she has difficulty concentrating
18   and has difficulty attending to tasks." Regarding Ms. Saffon's ability to work, he
19   wrote, "I would encourage the patient to a trial of work if she feels that she is
20   able." (Emphasis added). AR 65.

21       11. Ms. Saffon wrote to MetLife on March 17, 2003.  She explained that
22   she was no longer taking any medication for her condition "because everything
23   that has been prescribed has had no beneficial effect and in addition gave me
24   severe side effects." Additionally, she wrote that her condition had not changed
25   for a year and that her headaches and neck pain were "moderately severe 24 hours
26   a day." Regarding a trial of work she wrote, "I do not feel capable at this time,
27   the constant pain makes it very difficult for me to concentrate and to even carry
28   out simple tasks. When the pain gets very severe, it affects my memory and even

Charles J. Fleishman

1  my speech. I do wear a neck brace most of the time, but I'm still unable to stay
2  in any one position for more than a few minutes at a time, if I do, the pain on my
3  neck becomes unbearable from the pressure, which in turn makes my headaches
4  even worse, especially when I try to do things that require me to look down, like
5  writing, reading, even simple things like cooking, doing dishes, or even sitting
6  down to pay bills, have become very difficult." AR 63-64.

7       12. MetLife had Dr. Thomas review the plaintiff's medical records again
8  on April 18, 2003. In answer to the question of whether the medical information
9  contains "clear, detailed, objective medical documentation supporting inability to
10 return to own work/occupation" he responded in the negative. Yet, he recognized
11 that "Certainly there are recognized degenerative changes about the cervical spine
12 which, in all likelihood, produce ongoing discomfort and headache." He then
13 noted the truism that "pain is a subjective finding." He concluded his report with
14 a "long series of unconnected adjectives" totally meaningless to the plan's test for
15 disability: "this file lacks clear, sequential, detailed, objective clinical information
16 which would completely preclude Ms. Saffon from an attempt at return to work
17 as a (sic) Administrative Assistant -- Mortgage." AR 51-53.

18      13. MetLife sent Dr. Thomas's April 18, 2003 report to Dr. Kudrow. He
19 was asked if he agreed with the expressed "findings." MetLife told him that if he
20 did not respond by May 5, 2003, "we will presume you are in agreement with the
21 findings of the review." AR 55.

22      14. On June 23, 2003, after paying benefits to the plaintiff since June 10,
23 2002, based on a finding that she was unable to perform her regular occupation,
24 MetLife terminated the benefits retroactive to June 16, 2003. The termination of
25 benefits was not because of a change in the test for disability from "own
26 occupation" to " any occupation." The plan/policy provides for 24 months of
27 benefits under the "own occ" definition of disability and the plaintiff had only
28 received one year of benefits at the time they were terminated. The termination

Charles J. Fleishman                    4

1   letter was in the most general of terms.  In spite of the positive X-ray (AR 92) and
2   MRI (AR 267) findings that show significant disc encroachments at multiple levels
3   into the spinal canal, it falsely told Ms. Saffon that "Physical examinations have
4   been within normal limits."  The letter said, "The medical information provided
5   no longer provides evidence of disability that would prevent you from performing
6   your job or occupation.  You no longer meet the definition of disability. . ." AR
7   49.

8       15.  On July 28, 2003, Dr. Kudrow responded to MetLife's request for his
9   comments on the report authored by Dr. Thomas.  Dr. Kudrow pointed out that
10  "MRI of the cervical spine revealed significant disc and osteophyte changes in the
11  cervical spine suggesting a root cause of her chronic neck pain and perhaps
12  headaches. . . . She remains unable to function at her previous level of productivity
13  and in fact is unable to tolerate sustained sitting, standing, bending, lifting,
14  computer work etc. This problem renders her disabled and has thus far precluded
15  her from achieving any level of gainful employment."  AR 41.

16      16.  On August 1, 2003, Ms. Saffon administratively appealed the
17  termination of her benefits.  AR 44.

18      17.  Dr. Robert Menotti on behalf of MetLife did a medical record review
19  and wrote a report on September 15, 2003.  In commenting on the last report from
20  Dr. Kudrow, Dr. Menotti wrote: "He [Dr. Kudrow] states that she is unable to
21  function at her previous level of productivity and is unable to tolerate sustained
22  sitting, standing, bending, lifting, or computer work. *This is despite the fact that*
23  *she has never returned to work and therefore we do not know specifically what*
24  *this claimant is able to tolerate or not with respect to her capacity to return to*
25  *work*." (Emphasis added.)  Dr. Menotti ignored the plaintiff's inability to carry out
26  even simple tasks such as cooking, doing dishes, and sitting down to pay bills.
27  AR 63-64.  Dr. Menotti further noted that "The MRI of April 28, 2003, is
28  unchanged from that of 01/12/02."  AR 22-23.

Charles J. Fleishman                    5

1    18. On September 23, 2003, MetLife denied the administrative appeal. In
2 the denial letter, MetLife, acknowledged that Dr. Kudrow was of the opinion that
3 Ms. Saffon was disabled; that an MRI revealed "significant disc and osteophyte
4 changes of the cervical spine;" and that Dr. Kudrow reported that the plaintiff was
5 "unable to function at your previous level of productivity and are unable to tolerate
6 sustained sitting, standing, bending, lifting, computer work, etc." But, MetLife
7 stated for the first time, "It is not clear what Dr. Kudrow's used as a basis for
8 these reported limitations as we've not been furnished with a Functional Capacity
9 Evaluation that would objectively measure and document your current level of
10 functional ability." AR 24-26.

11    19. MetLife had never before suggested, sought, asked for, or hinted at a
12 Functional Capacity Evaluation (FCE) to the plaintiff or Dr. Kudrow. Neither Dr.
13 Thomas nor Dr. Menotti had ever mentioned an FCE.

14    20. An FCE conducted at this time would not be probative regarding the
15 plaintiff's condition at the time her benefits were terminated. Declaration of Paul
16 Fleishman; Report of Dr. Barry S. Ostroff pg. 7.

17    21. The denial letter relied on the record review report done by Dr. Menotti
18 discussed above. Relied upon as a reason justifying the termination of benefits
19 was the fact that "the MRI of April 28, 2003 documents degenerative changes
20 from C5/6-C6/7, but indicates this is unchanged from the prior January 12, 2002
21 MRI. No progression in degeneration is documented." AR 24-26.

22    22. The other reason given for denying the administrative appeal was the
23 fact that the plaintiff's disability resulted from self reported pain; MetLife ignored
24 the MRI's and xrays that evidenced the underlying causes of the pain. There is
25 no provision in the policy/plan excluding from benefits disability caused by
26 subjective pain.

27    23. Dr. Clark Soderlund, the plaintiff's internist, was not familiar with her
28 orthopedic condition nor any of the other conditions that contributed to Ms.

1  Saffon's disability.  Note of Dr. Soderlund Exhibit 113B.

2         24.  The defendant ERISA plan is insured by MetLife.  SPD 32.

3         25.  The Plan administrator is Wells Fargo & Company.  SPD 32, 67.

4         26.  Discretion to interpret terms of the plan is given to MetLife.  SPD 3.

5  Discretion to interpret terms and to "determine eligibility for and entitlement to

6  Plan benefits" is given to "the Plan administer and other Plan fiduciaries."  SPD

7  34.  "The Plan Administrator . . . may delegate its duties and discretionary

8  authority . . . to certain designated personnel of Wells Fargo & Company,

9  including but not limited to the Director of Human Resources and the Director of

10 Compensation and Benefits."  SPD 67.

11        27.  The plan defines disability, as it applies to the facts of this case, to exist

12 when "due to sickness, pregnancy or accidental injury, you are receiving

13 Appropriate Care and Treatment from a Doctor on a continuous basis; and . . . you

14 are unable to earn more than 80% of your Predisability Earnings or Indexed

15 Predisability Earnings at your Own Occupation for any employer in your Local

16 Economy."  After to years' of receiving benefits, the test for disability changes to

17 an "any occupation" test.  SPD 12.

18                        **CONCLUSIONS OF LAW**

19        1.  MetLife has been delegated full discretion to interpret plan provisions

20 and to determine eligibility for benefits.

21        2.  MetLife, as the decider of entitlement to benefits under the plan and as

22 the payor of the benefits, has a conflict of interest.

23        3.  Because of its conflict of interest, a modified abuse of discretion standard

24 of review should be used by this court in reviewing MetLife's decision to

25 terminate the plaintiff's benefits.  Abatie v. Alta Health 458 F.3d 955 (9th Cir.

26 2006).

27        4. In determining the degree of deference the court should give to MetLife's

28 decision, factors the district court may consider include: (1) whether the defendant

Charles J. Fleishman                              7

1   ignored the plaintiff's complaints of pain, which are inherently subjective and not

2   easily determined by objective measurement; (2) whether defendant had a

3   "meaningful dialogue with its beneficiary in deciding whether to grant or deny

4   benefits," and (3) whether defendant "took various of [plaintiff's] doctors'

5   statements out of context, or otherwise distorted them," or "omit[ted an] important

6   qualifier." Saffon v. Wells Fargo 522 F.3d 863, 872-873 (9th Cir. 2008). If so,

7   such factors suggest that "less deference should be given to the decision of the

8   claims administrator." id. at 873.

9       5. MetLife ignored the plaintiff's complaints of pain by requiring that she

10  prove pain by objective evidence. "Pain is a completely subjective phenomenon

11  and cannot be objectively verified or measured." Saffon v. Wells Fargo at 873.

12  Objective evidence of pain is simply not available with regard to the plaintiff's

13  claim and MetLife's requiring it reflects negatively on the deference this court

14  owes to MetLife's decision in this case.

15       6.   MetLife's letter terminating her benefits was not a meaningful

16  communication with her. "The termination letter does suggest that Saffon can

17  appeal by providing 'objective medical information to support her inability to

18  perform the duties of her occupation,' but does not explain why the information

19  Saffon has already provided is insufficient for that purpose." Saffon at 870.

20       7. MetLife relied on the medical opinions of Drs. Thomas and Menotti, both

21  of which were ambiguous. "Dr. Thomas's statement that Saffon's file 'lacks clear,

22  sequential, detailed, objective clinical information which would completely

23  preclude Ms. Saffon from an attempt at return to work" is little more than a long

24  series of unconnected adjectives. How an absence of information could preclude

25  Saffon from returning to work, what function the word 'sequential' plays in this

26  litany, or why Dr. Kudrow's report and attached MRI did not amount to 'objective

27  clinical information' or was not 'clear' is left to the imagination." Saffon at 870.

28  Dr. Menotti "remained unconvinced 'that the claimant's self-reported headache and

1  chronic pain syndrome has been enough to preclude her from' working.  Dr.
2  Menotti does not explain why he is unconvinced, nor what Saffon or Dr. Kudrow
3  need to do to convince him."Saffon at 871.

4      8.  MetLife's suggestion in its final denial letter, at a time that Saffon could
5  do nothing about the suggestion, that she should have had a Functional Capacity
6  Evaluation (FCE) is evidence that the termination of the claim "was colored by
7  MetLife's conflict of interest."  Saffon at 872.

8      9.  MetLife wrote in its letter denying the administrative appeal that "the
9  MRI of April 28, 2003 documents degenerative changes [in your cervical spine],
10 but indicates this is unchanged from the prior January 12, 2002 MRI.  No
11 progression in degeneration is documented."  "MetLife does not explain why
12 further degeneration is necessary to sustain a finding that Saffon is disabled.  After
13 all, MetLife had been paying Saffon long-term disability benefits for a year, which
14 suggests that she was already disabled.  In order to find her no longer disabled,
15 one would expect the MRIs to show an improvement, not a lack of degeneration."
16 Saffon at 871.

17     10.  MetLife took statements of Dr. Kudrow out of context in an apparent
18 effort to support a denial of benefits.  Saffon at 873.

19     11.  MetLife contacted Dr. Soderlund directly without disclosing that fact
20 to her at a meaningful time.  Saffon at 873.

21     12.  For all of the above reasons, MetLife's termination of the plaintiff's
22 benefits was an abuse of discretion and judgment shall be entered for the plaintiff.

23     13.  The plaintiff is entitled to an award of all benefits due under the plan
24 until the test for disability would have changed from "own occupation" to "any
25 occupation."

26     14.  The plaintiff is entitled to interest on the amount of arrears due her.
27 Blanton v. Anzalone 760 F.2d 989 (9th Cir. 1985); Nelson v. EG&G 37 F.3d 1384
28 (9th Cir. 1994).  ERISA itself does not mention interest and therefore it does not

Charles J. Fleishman

1   set the rate of interest.  The use of a state law setting an interest rate for arrears

2   owed by an ERISA disability plan is appropriate.  <u>Florence Nightingale v. Blue</u>

3   <u>Cross</u> 41 F.3d 1476, 1484 (11th Cir. 1995), <u>Allison v. BankOne-Denver</u> 289 F.3d

4   1223, 1243-44 (10th Cir. 2002).  California Insurance Code §10111.2 provides for

5   interest at the rate of 10% per annum to be paid on withheld disability benefits.

6   The Supreme Court in <u>Unum v. Ward</u> 526 U.S. 358, 119 S.Ct. 1380, 1386 fn1,

7   143 L.Ed.2d 462, 471 fn1 (1999) held that insurance law is not preempted by

8   ERISA.  Insurance Code §10111.2 governs only disability insurance and is thus

9   not preempted by ERISA and therefore applies to withheld disability insurance

10  benefits owed by insured plans.

11      15.  The plaintiff is entitled to attorney fees and costs from the defendant.

12  The plaintiff is to bring a motion for such fees and costs according to the Local

13  Rules of this court.

14      16.  The matter is remanded back to the defendant to determine plaintiff's

15  eligibility for benefits under the plan's "any occupation" test.  All of the ERISA

16  regulations, including those dealing with the time limits within which decisions

17  must be made, are to be applied to the remand determination.

18      17.  This court will retain jurisdiction of this matter until defendant's

19  determination that the plaintiff is entitled to benefits under the plan's "any

20  occupation" test or the plaintiff is satisfied with a determination that she is not

21  entitled to additional benefits.  If either condition occurs, the parties are to jointly

22  notify the court within two weeks of the decision.  If the plaintiff is not satisfied

23  with the decision, she shall bring a motion to set the matter for a scheduling

24  conference.

25  Dated:  SEP 1 5 2009

26

27  _____

28  Hon. Otis D. Wright II
    Judge of the District Court